IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROSEANNA A. WILLIAMS,

Civil No. 03-6027-CO

        Plaintiff,

FINDINGS AND RECOMMENDATION

   v.

KLAMATH COUNTY; et al.,

        Defendants.

COONEY, Magistrate Judge.

In plaintiff's second amended complaint, plaintiff alleges claims for section 1983 due process violations against defendants Klamath County and Carrie Buck, and claims for defamation and intentional infliction of emotional distress against defendant Developmental Systems, Inc. Plaintiff seeks economic damages, non-economic damages, injunctive relief, and reasonable attorney's fees and costs. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Before the court is defendants Klamath County's and Carrie Buck's motion for summary judgment (#57).

## I. FACTS

In making the following findings of fact, the court considers the evidence in the light most favorable to plaintiff:

Defendant Developmental Systems, Inc., (DSI) is a private corporation that provides services

to developmentally disabled individuals. DSI operates a program in Klamath Falls, Oregon, called an "Alternative to Employment" (ATE) program. (Ex. 106, Defendant DSI's Response to Plaintiff's First Set of Interrogatories p. 9; OAR 411-345-0010). DSI operates the ATE program in Klamath Falls under a contract with Klamath County. (Ex. 201.) ATE services are regulated by Oregon Administrative Rules promulgated by the Department of Humans Services of the State of Oregon. ATE services are provided to persons whose disabilities preclude them from employment. The overall purpose of alternative to employment services is to provide services that promote individuals' opportunities for integration, independence and productivity and that are based upon individual needs. (Ex. 106, Defendant DSI's Response to Plaintiff's First Set of Interrogatories p. 9; OAR 411-345-0010).

DSI's ATE program provides services to developmentally disabled persons during the day at specific facilities. The ATE program is intended to improve the quality of life for developmentally disabled individuals by providing cross motor, fine motor, cognitive, social, and emotional activities for the individuals. (Ex. 106).

Plaintiff was hired by DSI on July 1, 1999, as an instructor at an ATE facility and a group home for developmentally disabled persons. From April 2000, until plaintiff's termination on February 5, 2002, plaintiff worked at DSI's ATE facility in Klamath Falls, Oregon. Plaintiff's position as of August 30, 2001, was "lead personal support assistant." (Ex. 102, Personnel Action Forms; Ex. 104, Job Description).

Defendant Klamath County was not plaintiff's employer. (Ex. 105 Williams Dep.)

As a lead personal support assistant, plaintiff was responsible for assisting developmentally disabled persons. This assistance included training activities, assistance with personal hygiene,

FINDINGS AND RECOMMENDATION - 2

assistance in housekeeping skills, and other forms of assistance. In addition, plaintiff was required to provide supervision, guidance, and mentoring to other personal support assistants employed at the ATE facility. (Exs. 104, 202). Plaintiff provided input into the evaluations of the PSA staff. (Ex. 203 Weathers Dep. 7:15-23; 17:17-18:1; 50:18-25.)

Klamath County Mental Health Division is a Division of Klamath County. One of the functions of the division is the provision of services to developmentally disabled individuals. This function is assigned to Klamath County pursuant to a contract with the State of Oregon. This function is carried out by Klamath County's Developmental Disabilities Services (DDS). (Affidavit of Carrie Buck). In a "Department of Human Services 2001-2003 County Financial Assistance Agreement," the State agreed to provide financial assistance for community mental health and developmental disabilities programs, and agreed that it "shall" provide technical assistance to the county in the delivery of services to the extent resources are available to the Department for this purpose. (Ex. 214.)

The duties of DDS include providing case management services for developmentally disabled adults, investigating allegations of abuse against developmentally disabled adults, and providing protective services for developmentally disabled adults who have been abused. (Affidavit of Carrie Buck).

Catherine Barnes is an employee of Klamath County. She is a case manager for Klamath County DDS. In January, 2002, Barnes was also the lead investigator for Klamath County DDS. In this role, Barnes was responsible for conducting investigations of alleged abuse against developmentally disabled persons who receive services from Klamath County. At the conclusion of an abuse investigation, Barnes was required to conclude whether the allegations of abuse were

substantiated, unsubstantiated, or inconclusive. Barnes was then required to incorporate her findings and conclusions within an "Abuse Investigation and Protective Services Report" on a form provided by the State of Oregon. This report was then required to be kept on file with Klamath County, and a copy was to be provided to the State of Oregon's Office of Investigations and Training (OIT). (Affidavit of Catherine Barnes).

On January 29, 2002, Barnes received a report by telephone from Judy Gerard, an employee of DSI at the ATE facility in Klamath Falls. Gerard reported to Barnes that she had seen plaintiff pinch a developmentally disabled adult--referred to herein as "MM"--on the inside of his upper left arm, and on the upper left side of his back, under the shoulder blade. (Ex. 101, Abuse Investigation and Protective Services Report). Gerard told Barnes that MM "had been pinched and hurt really bad and he was bleeding and it was just terrible and she had to report it, she just had to." (Ex. 204 Barnes Dep. 23:7-10.) Barnes testified that Gerard sounded "kind of hysterical." (Ex. 204 Barnes Dep. 23: 5.) Both DSI policy and Oregon State Law explicitly mandated that suspected abuse be reported immediately to the local DSI director. (Ex. 211; ORS 430.743.)

After receiving Gerard's report, Barnes drove to the group home where MM resided. At the group home, Barnes examined MM, and saw one red welt on the inside of MM's left arm, and one red welt on the left side of MM's back, below his shoulder blade. (Ex. 101, Abuse Investigation and Protective Services Report.)

On January 30, 2002, Barnes interviewed Robyn Baker Lindsey, an employee of DSI, regarding the January 29, 2002, incident. Baker Lindsey told Barnes that she saw MM attempting to walk into the main hall of the ATE facility from the dining room; an area where he was not to go at that time. Baker Lindsey told Barnes that she saw Gerard--the person assigned to MM at that

time--ask for help. Baker Lindsey then told Barnes that she saw plaintiff go into the dining room, grab MM by the left arm, and pinch MM. Baker Lindsey told Barnes that she could see that this action hurt MM. Baker Lindsey stated that MM then went into the activity room, and plaintiff followed him. Baker Lindsey stated that plaintiff then pinched MM on the back on the left side of his shoulder blade. (Ex. 101, Abuse Investigation and Protective Services Report.)

At her deposition, Baker Lindsey indicated that she believed that Gerard had reported and Barnes was investigating "the improper use of a shirt-belt restraint." (Ex. 206 Baker Lindsey Dep. 13:14-16.) Baker Lindsey indicated that she was not a witness to the incident. (Ex. 206 Baker Lindsey Dep. 13:19-20.) Baker Lindsey testified that she told Barnes that after the alleged incident on January 29, 2002, Gerard called her into the bathroom to look at marks on MM. (Ex. 206 Baker Lindsey Dep. 13:22-25.) Baker Lindsey testified that Gerard told her that she had witnessed a shirt belt hold being applied to MM and that when that the shirt belt hold was applied, MM's skin was pinched instead of just his shirt being grabbed. (Ex. 206 Baker Lindsey Dep. 14:20-22.) However, at her deposition, Barnes testified that she thought Baker Lindsey told her that she was five feet away when she saw plaintiff pinch MM. (Ex. 204 Barnes Dep. 95:17-20.) Baker Lindsey testified that she saw at least one red mark/welt on MM's upper back shoulder area. (Ex. 206 Baker Lindsey Dep. 15:18-22; 16:3-4.) She stated she saw no broken skin or bruising on MM's back at the time she saw it. (Ex. 206 Baker Lindsey Dep. 18:18-22.) Baker Lindsey further testified that she did not write an incident report and doesn't recall signing off on an incident report about the mark(s) she observed. (Ex. 206 Baker Lindsey Dep. 17:14-25; 18:1-3.) She stated that after she saw the mark(s), she just went back to work and didn't talk to anyone. (Ex. 206 Baker Lindsey Dep. 18:8-13.)

After interviewing Baker Lindsey, Barnes interviewed Rita Hastin Weber. Hastin Weber told

Barnes that she did not see the alleged pinching, but she observed MM after the incident in the bathroom at the ATE facility. Hastin Weber told Barnes that she saw one red welt on the left side of MM's back shoulder blade, and one red welt on MM's left arm. Hastin Weber told Barnes that plaintiff entered the bathroom while she, Gerard, and Baker Lindsey were inspecting MM, and that plaintiff asked them what they were doing, and told them to "hurry up." (Ex. 101, Abuse Investigation and Protective Services Report).

At her deposition, Hastin Weber testified that she believed Gerard asked her to "look at MM's back where it had been scratched by Rosie." (Ex. 207 Hastin Weber Dep. 14:8-11; 15:1-3.) Hastin Weber testified that when she looked at MM's back, she saw three scratches. (Ex. 207 Hastin Weber Dep. 15:25-16:6.) Hastin Weber also testified that when Barnes interviewed her, MM was brought into the room and she and Barnes looked at his back. (Ex. 207 Hastin Weber Dep. 18:2-22.) Hastin Weber further testified that she did not report the scratches she allegedly saw on MM even though she was mandated by law to report suspected abuse. (Ex. 207 Hastin Weber Dep. 23:11-25.) In addition, although Hastin Weber indicated that she, Baker Lindsey, and Gerard were all in the bathroom at the same time examining the alleged marks on MM, (Ex. 207 Hastin Weber Dep. 19:23-25; 22:21-23:3), Gerard testified that she, Baker Lindsey, and Hastin Weber were not in the bathroom at the same time. (Ex. 205 Gerard Dep. 43:17-22.)

Next, Barnes interviewed Gerard. Gerard informed Barnes that she was a new staff member at the ATE facility. Gerard told Barnes that she was assigned one-on-one to MM at the time of the incident. Gerard told Barnes that she was trying to keep MM from going into the main hall from the dining room, and that she asked for help. Plaintiff then arrived in the dining room, and pinched MM in the back of the left arm. Gerard stated that plaintiff said, "you just have to show them who's Boss."

Gerard told Barnes that plaintiff then followed MM into the activity area, and pinched MM on the left side of the back. Gerard stated that she could see that plaintiff hurt MM, and that MM became upset and started taking down his pants. Gerard stated that she and Baker Lindsey then took MM into a bathroom, where they examined MM with Hastin Weber. (Ex. 101, Abuse Investigation and Protective Services Report; Ex. 209.)

Although Gerard had only worked at the ATE since mid January, (Ex. 209 ), she had been employed by DSI since August 3, 2001, as a PSA at one of the group homes, (Ex. 208). At her deposition, Gerard testified that MM was attempting to go into the main hallway and that plaintiff forced MM to turn in the opposition direction by pinching him. (Ex. 205 Gerard Dep. 23:23-25; 30:14-17; 31:25-32:1.) Gerard testified that plaintiff then pushed him into the main room where she pinched him on the upper back and pushed him onto a table, (Ex. 205 Gerard Dep. 32:11-13; 33:13-14), and MM flipped around while plaintiff was pushing him onto the table so that he ended up sitting on the table, (Ex. 205 Gerard Dep. 38:15-20; 39:1-4).

At 4:43 p.m. on January 30, 2002, Barnes received an anonymous call. The caller told Barnes about a previous incident on October 29, 2001, when plaintiff had thrown MM onto a beanbag chair, so that MM's head hit the wall and broke the plaster. The caller told Barnes that a witness to the incident was Ron Igou. (Ex. 101, Abuse Investigation and Protective Services Report.)

On January 31, 2002, Barnes interviewed plaintiff regarding the allegations of abuse on October 29, 2001, and January 29, 2002. Barnes' report states that, when plaintiff was asked about what had happened on January 29, 2002, plaintiff responded at first that she guided MM into the dining room, and that "nothing happened." (Ex. 101, Abuse Investigation and Protective Services Report.) Barnes' report states that, when asked again about the allegations of abuse against her

related to the January 29, 2002, incident, plaintiff responded that she "would never hurt anyone." Barnes' report indicates that plaintiff did not specifically deny that she pinched MM on the arm and back, when told about the allegations. (Ex. 101, Abuse Investigation and Protective Services Report.)

Plaintiff declares that she told Barnes that she had used a shirt/belt restraint. (Williams Decl.) In her deposition, Barnes stated that when she told plaintiff that there two marks on MM and asked plaintiff if she knew how they got there, plaintiff told Barnes that "she didn't know anything about them." (Ex. 204 Barnes Dep. 59:18-19; 60:4.)

As to the January 29, 2002, incident, plaintiff testified that she was sitting at a table in the dining room when MM came through the door with Gerard following him. (Ex. 216 110:15-19.) Gerard asked her for help. Plaintiff stood up and tried to verbally redirect MM. MM grabbed her shirt, then grabbed the hair of a consumer who was standing next to her. She side-stepped MM to do a shirt-belt restraint so he would let go of the other consumer and then moved with him from the dining room into the main program room and plaintiff released him. (Ex. 216 Williams Dep. 107:11-25-110:4.) According to Barnes, if this is what happened, plaintiff used an inappropriate and unauthorized restraint on MM. (Affidavit of Catherine Barnes; Ex. 101, Abuse Investigation and Protective Services Report.)

As to the October 29, 2001, incident, plaintiff testified that she was working one-on-one with MM, that he was quite agitated and "was all over the building." She followed him as he took off for the main program room and then the sensory room. She was behind him when he pushed open the door to the sensory room and the door almost hit her as it closed. She stated that, "he just jumped onto the beanbag and misjudged and hit the beanbag and the floor and kind of threw his head back,

and that's when he put the hole into the sheetrock." (Ex. 216 Williams Dep. 45:10-20.) Plaintiff stated that the sensory room door was closed when this occurred and she did not see anyone. (Ex. 216 Williams Dep. 51:1-4.) Plaintiff testified that she reported the incident immediately to Paula Weathers, (Ex. 216 Williams Dep. 54:6-9), told staff, including Igou, about the incident, (Ex. 216 Williams Dep. 193:3-15). Plaintiff also filed an incident report about it. (Ex. 220.)

On February 4, 2002, Barnes interviewed Igou, another DSI employee. Igou told Barnes that he had seen plaintiff swing MM into a wall on October 29, 2001, causing MM's head to break the wall. Barnes observed a patched hole on the wall in the sensory room where Igou stated he had observed the incident. (Ex. 101, Abuse Investigation and Protective Services Report.).

Igou was mandated by state law to report any abuse he observed. Although Igou testified at his deposition that, at the time of the incident, he had not yet received training about reporting suspected abuse and neglect and on how to write an incident report, (Ex. 210 Igou Dep. 22:5-18; 23:2-6), documents from Igou's personnel file show that he had received training about what abuse and neglect means and had participated in an incident report. (Exs. 211 & 212.) Paula Weathers testified that new employees would not be allowed to work with consumers before receiving mandatory abuse training. (Ex. 203 Weathers Dep. 43:1-44:3.)

In her report, as to the October 29, 2001, incident, Barnes stated that Igou told her he saw plaintiff swing MM into the wall resulting in MM's head breaking the drywall. Barnes also stated that Igou had not reported the incident; he told Barnes that he had told other coworkers about it "and everyone was horrified." (Ex. 101, p.7 (Interview of 2/4/02)). Igou and the other coworkers were all mandatory reporters, *(see* Ex. 211), and none of them reported it.

As of February 4, 2002, Barnes had concluded that the allegations of abuse relating to the

January 29, 2002, incident were substantiated. Barnes had not made any conclusions regarding the October 29, 2001, incident as of February 4, 2002. (Affidavit of Catherine Barnes).

In her deposition, plaintiff testified that Barnes asked her if she was burned out and if she was ready to move on and find other work. Barnes told plaintiff that plaintiff had been accused of two incidents of abuse and that all the witnesses confirmed the accusations. Plaintiff testified that Barnes "pretty much" said to her that she was guilty of the abuse. (Ex. 216 Williams Dep. 194:20-195:25.)

Barnes informed defendant Carrie Buck on February 4, 2002, of her findings regarding the January 29, 2002, incident. Defendant Buck then called Donald Acker, the Executive Director for DSI in Portland, and discussed corrective action plans with Mr. Acker. The corrective action plans included abuse reporting training to be conducted for DSI employees, and the provision of in-house memos to Mr. Acker in Portland. Defendant Buck did not recommend any discipline or personnel action against plaintiff. (Affidavit of Carrie Buck).

Barnes knew that it was DSI's practice to discharge employees against whom allegations of abuse had been substantiated. (Ex. 204 Barnes Dep. 79:11-19.)

On February 4, 2002, DSI terminated plaintiff's employment. (Ex. 102, Personnel Action Forms).

On February 20, 2002, Barnes completed her final report, in which she expressed her conclusions that the allegations of abuse on October 29, 2001, and January 29, 2002, were substantiated. A copy of the report was retained at the Klamath County DDS office, and a copy was forwarded to the Office of Investigations and Training of the State of Oregon. (Ex. 101, Abuse Investigation and Protective Services Report; Affidavit of Catherine Barnes).

In coming to her conclusions, Barnes considered that there were two eyewitnesses to the

FINDINGS AND RECOMMENDATION - 10

abuse on January 29, 2002. (Affidavit of Catherine Barnes; Ex. 101, Abuse Investigation and Protective Services Report). Baker Lindsey, one of the alleged witnesses, stated at her deposition that she did not witness the alleged abuse and that she reported to Barnes that Gerard had asked her to look at marks on MM. (Ex. 206 Baker Lindsey Dep 13:19-25.) The accounts given by the witnesses were consistent with Barnes' observations. The marks on MM were in the same location as the abusive contact reported by the witnesses. Barnes considered the two witnesses to be credible. Gerard, the reporter of the abuse, was a new employee at the ATE with no history of conflict with plaintiff to suggest a motive to be untruthful. (Affidavit of Catherine Barnes; Ex. 101, Abuse Investigation and Protective Services Report; Exs. 208, 209.) Plaintiff stated at her deposition that she requested Barnes to "investigate a little more carefully and to talk to some of the other staff members that were at the ATE." (Ex. 216 Williams Dep. 196:5-12.) Barnes testified that she did not pursue whether there were any problems among the staff even though plaintiff "had said that." Barnes did not know whether that was true or not, because she "didn't believe it." (Ex. 204 Barnes Dep. 66:4-24.) Further, Barnes found Igou's account to be credible. Barnes did not find plaintiff credible due in part to the fact that she would not specifically deny the allegations of abuse on January 29, 2002. (Affidavit of Catherine Barnes; Ex. 101, Abuse Investigation and Protective Services Report). In her deposition, Barnes stated that when she told plaintiff that there two marks on MM and asked plaintiff if she knew how they got there, plaintiff told Barnes that "she didn't know anything about them." (Ex. 204 Barnes Dep. 59:18-19; 60:4.)

Neither Barnes nor defendant Buck ever recommended or advised DSI regarding any employment action to be taken against plaintiff. (Affidavits of Catherine Barnes and Carrie Buck).

The February 20, 2002, report of Barnes did not state the reasons for plaintiff's termination.

Barnes was not involved in the termination decision. (Ex. 101, Abuse Investigation and Protective Services Report; Affidavit of Catherine Barnes).

Final policies governing abuse investigations are formulated by the State of Oregon. These policies come from the Administrative Rules of the Department of Human Services. Further, the State of Oregon's Office of Investigations and Training (OIT) trains all Klamath County investigators regarding abuse investigations. OIT also oversees all Klamath County abuse investigations. Neither defendant Klamath County nor defendant Buck formulate final policy in the area of abuse investigations. (Affidavit of Carrie Buck).

At Weathers' deposition, in response to plaintiff's counsel's question, "Do you recall telling [plaintiff] orally that she had the right to appeal the termination?" Weathers responded, "Yes, we talked about that," and Weathers told her that "her appeal is with the county and she needs to contact them for the appeal." (Ex. 203 Weathers 37:3-10.)

Plaintiff's chosen field is working with individuals with developmental disabilities. (Williams Decl.) Her next preference would be to work as a caregiver to or personal assistant to individuals who are ill or disabled. However, the substantiated abuse allegations and termination of my employment have prevented her from obtaining any work as a caregiver. (Williams Decl.) She has applied for positions with Klamath County mental health, with Spokes Unlimited working with disabled, as a caregiver at Reach, Pelican Point, Crystal Terrace, Clairmont Retirement Center and Klamath Hospice. (Ex. 216 Williams Dep. 85:19-86:7, 17-24; 87:1-8.) Plaintiff applied for a residential specialist position with the county at least six times. (Ex. 216 Williams Dep. 89:23-90:18.) She was interviewed one time by the county; she told the interviewer "what happened." After that, she did not get any interviews for a position involving working with the developmentally

disabled. (Ex. 216 Williams Dep. 90:23-91:1-15.)

Plaintiff has heard that people talked about her being accused of abuse. (Ex. 216, 67:15-68:9.) One day when she went to the window at the employment office to pick up a job referral, the employee at the window remarked to her, "Oh, you're the one that was supposed to have hurt that consumer, wasn't you?" (Ex. 216 Williams Dep. 121:1-25.)

The letter plaintiff provided to defendant Buck stated: "I am requesting an appeal on the decision of the physical abuse charge on client MM at D.S.I." (Ex. 103.)

## II. <u>LEGAL STANDARD</u>

A moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact . . . ." Fed. R. Civ. P. 56(c); <u>Freeman v. Oakland Unified Sch. Dist.</u>, 291 F.3d 632, 636 (9th Cir. 2002). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. <u>Playboy Enters., Inc. v. Welles</u>, 279 F.3d 796, 800 (9th Cir. 2002).

The moving party must carry the initial burden of proof. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986). The moving party meets this burden by identifying for the court portions of the record on file which demonstrate the absence of any genuine issue of material fact. <u>Id.</u>; <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. <u>Allen v. City of Los Angeles</u>, 66 F.3d 1052, 1056 (9th Cir. 1995). All reasonable inferences are drawn in favor of the non-movant. <u>Gibson v. County of Washoe</u>, 290 F.3d 1175, 1180 (9th Cir. 2002), <u>cert. denied</u>, 537 U.S. 1106 (2003).

If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts which show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); <u>Auvil v. CBS "60 Minutes"</u>, 67 F.3d 816, 819 (9th Cir. 1995); <u>see Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 & n.4 (1986). If the moving party presents evidence which, taken by itself, would establish the right to a directed verdict at trial, the motion for summary judgment must be granted, in the absence of any significant probative evidence tending to support the opposing party's theory of the case. <u>THI-Hawaii, Inc. v. First Commerce Fin. Corp.</u>, 627 F.2d 991, 993-94 (9th Cir. 1980); <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. <u>Devereaux</u>, 263 F.3d at 1076.

### III. <u>DISCUSSION</u>

Defendants Klamath County and Carrie Buck contend that plaintiff's name clearing hearing claims against them fail as a matter of law because plaintiff was not a public employee; Klamath County did not terminate plaintiff and was not her employer; the reasons for plaintiff's discharge were not publicly disclosed; the report did not contain any false or defamatory statements concerning plaintiff; plaintiff did not sufficiently apprise the County of her desire for a name clearing hearing; and the statements were not stigmatizing. Defendants contend that there can be no liability resulting from the statements in Ms. Barnes report of substantiated abuse because those statements were absolutely privileged and do not give rise to liability for defamation. Defendants contend that Carrie Buck is entitled to qualified immunity because it was not clearly established in February 2002 that

a private employee has a right to a name clearing hearing or that a non-employer has a duty to provide one, and because plaintiff's constitutional rights were not violated, as discussed. Defendants contend that Klamath County had no unconstitutional policy for which it can be liable under § 1983. In her response, plaintiff admits that she was not a public employee and that Klamath County was not her employer, but contends that private employees may have a claim against a public entity for violation of liberty interests where its conduct caused the termination of private employment and if the dismissal is for reasons that might seriously damage his standing in the community or effectively precludes future work in the person's chosen profession. Plaintiff contends that the report substantiating allegations of abuse was publicly disclosed; the report contained false and defamatory statements concerning her; her request for an appeal adequately apprised defendants that she wanted an opportunity to clear her name; and the statements labeling plaintiff as an abuser of a developmentally disabled person were stigmatizing. Plaintiff contends that state privileges are not a bar to a § 1983 claim. She further contends that defendant Klamath County was acting pursuant to a policy or practice in denying her a name clearing hearing. Plaintiff contends that defendant Buck is not entitled to qualified immunity as to the claim against her because her conduct violated a clearly established constitutional right. Defendants reply that a public employer cannot be liable for a private employer's decision to terminate a private employee in reaction to statements made by a public official; a private employee has no right to a name clearing hearing; there was no public disclosure of the report by the County defendants; the report was true; and plaintiff did not adequately apprise the County of her request for a name clearing hearing. Defendants also contend that Catherine Barnes is immune from liability under § 1983 for her investigation; the decision to deny plaintiff's appeal was made by a state official and not pursuant to any County policy, custom,

or practice; and defendant Buck is entitled to qualified immunity because she did not violate any clearly established constitutional rights of plaintiff.

"'To make out a cause of action under section 1983, [plaintiff] must plead that (1) the defendants acting under color of state law (2) deprived [her] of rights secured by the Constitution or federal statutes.'" Gini v. Las Vegas Metro. Police Dept., 40 F.3d 1041, 1044 (9th Cir. 1994) (quoting Thomas v. Carpenter, 881 F.2d 828, 829 (9th Cir. 1989)). Thus, plaintiff must show that defendant Klamath County[1] deprived her of federally protected rights. See Gini, 40 F.3d at 1044.

The liberty interest protected by the Due Process Clause includes an individual's freedom to work and earn a living. Portman v. County of Santa Clara, 995 F.2d 898, 907 (9th Cir. 1993). A liberty interest is implicated where a person's good name, reputation, honor, or integrity is damaged and the circumstances of the person's dismissal impose some stigma or other disability which forecloses further educational or employment opportunities. Brady v. Gebbie, 859 F.2d 1543, 1553 (9th Cir. 1988); Board of Regents v. Roth, 408 U.S. 564, 572-74 (1972); Harrington v. City of Portland, 677 F. Supp. 1491, 1500 (D. Or. 1987). When the government dismisses an individual for reasons that might seriously damage his standing in the community or significantly forecloses his freedom to take advantage of other employment opportunities, he is entitled to notice and a hearing to clear his name. Jablon v. Trustees of Cal. State Colleges, 482 F.2d 997, 1000 (9th Cir. 1973).

The charges must amount to accusations of moral turpitude--dishonesty or immorality--to invoke constitutional protection. Bollow v. Fed. Reserve Bank of San Francisco, 650 F.2d 1093, 1101 (9th Cir. 1981); Hyland v. Wonder, 972 F.2d 1129, 1142 (9th Cir. 1992); Harrington, 677 F.

---

[1]    References to defendant Klamath County includes defendant Carrie Buck, sued in her official capacity.

Supp. at 1501.  Charges that focus on lack of competence and inability to get along with others do not infringe a liberty interest.  Portman, 995 F.2d at 908.  "The mere fact that the charges may be unfair or untrue does not give rise to a constitutional claim:  'The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.'"  Id. (citation omitted).

Further, the charges must be published during the termination process.  Brady, 859 F.2d at 1552-53; Vanelli v. Reynolds Sch. Dist. No. 7, 667 F.2d 773, 777-78 (9th Cir. 1982).  Statements made after plaintiff's discharge cannot establish violation of a liberty interest.  See Botefur v. City of Eagle Point, Or., 7 F.3d 152 (9th Cir. 1993).

In Gini, plaintiff sued the police department and officer Mahony after she was fired from her job as a courtroom deputy clerk as a consequence of statements she made during an investigation by the police department.  Plaintiff alleged, among other constitutional claims, that she had a liberty interest in employment protected by the Due Process Clause because the reasons for her dismissal were stigmatizing.  The Ninth Circuit noted that, "The difficulty with Gini's case, however, is that assuming all these things to be true, the alleged retaliation was undertaken by Mahony (a state actor) whereas her alleged constitutional injury–being terminated without due process--was inflicted by her federal employer."  Gini, 40 F.3d at 1044.  The court, while noting that neither the police department nor officer Mahony was plaintiff's employer and, thus, neither terminated her employment, stated:  "However, we have recognized that '"[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'"  Id. (quoting Merritt v. Mackey, 827 F.2d 1368,

1371 (9th Cir. 1987)). In the circumstances there, the Ninth Circuit found that, because officer

Mahony did not, and could not, have directly deprived plaintiff of due process, "she must show that

it was reasonably foreseeable to him that his statement to her federal employer would cause her to

be terminated without a pre-termination or name-clearing hearing." Gini, 40 F.3d at 1044. Plaintiff's

complaint made no such allegations. The court concluded, therefore, that, "because Mahony did not

terminate Gini's employment without due process and did not know and should not reasonably have

known that her federal employer would terminate her employment without due process, Gini has

failed to state a claim under § 1983." Id. at 1044, 1043; see Aversa v. United States, 99 F.3d 1200,

1215-16 (1st Cir. 1996) (finding that plaintiff must allege that the loss of employment resulted from

"some further action by the defendant in addition to the defamation"; finding no viable constitutional

claim where a third party discharges or refuses to hire plaintiff solely as a result of the defendant's

defamation); Cooper v. Dupnik, 924 F.2d 1520, 1531-34 & n.25, 1536 (9th Cir. 1991) (and cases

cited, holding that state action must directly affect plaintiff's rights); Pendleton v. City of Haverhill,

156 F.3d 57, 62-63 (1st Cir. 1998) (finding no liberty interest claim stated because "a violation of

constitutional proportions under a 'stigma plus' theory exists only if, and to the extent that, the

opportunities lost are government benefices denied as a result of the governmental action," and

plaintiff worked for a non-governmental employer and lost a private, not public, position); Moore

v. Agency for Int'l Dev., 80 F.3d 546, 548 (D.D.C. 1996) (and cases cited).

 Here, while relying on cases that indicate that a non-governmental employee may state a §

1983 claim for deprivation of liberty interest against the government, plaintiff does not allege in her

complaint, nor does she argue on summary judgment, that Klamath County knew, or should

reasonably have known, that DSI would terminate her employment without due process based on the

Barnes report. The only evidence she discusses is evidence concerning DSI, but she offers no evidence to link Klamath County's conduct. Further, while her argument might infer that Klamath County should have known that she would be terminated as a result of the report, there are no facts which indicate that the County should have known that she would be terminated *without due process*, which is the constitutional injury complained of. See Gini, 40 F.3d at 1043 ("We hold that no § 1983 claim can be stated against the police officers who set the events in motion that culminated in Gini's termination, in the absence of any allegation that they knew, or reasonably should have known, that she would be terminated without due process.") On this record, the court finds that plaintiff fails to set forth facts which would show that she has a protected liberty interest claim against Klamath County.

An alternative, but connected ground, for finding that plaintiff has no liberty interest claim against Klamath County is that plaintiff sought and seeks a name-clearing hearing with Klamath County, rather than with her employer, DSI, who terminated her. At least one court has found that the name-clearing hearing should properly be with the employer. The District Circuit in Moore, 80 F.3d at 548, found that neither of the government officials denied him process because neither could have ordered the name-clearing hearing, or Codd hearing,[2] sought by plaintiff, because neither employed him. The Moore court described Codd as "noting that the sole purpose of such a hearing is to settle factual disputes between employer and employee." Id.

And, to the extent that the statements in the report were "published," which the parties dispute, such publication occurred after plaintiff's termination by DSI, rather than "incident to" her termination. It is undisputed that plaintiff was terminated by DSI on February 4, 2002, and the final

---

[2]     Codd v. Velger, 429 U.S. 624 627-28 (1977).

report was forwarded to the State Office of Investigations and Training on February 20, 2002.

For the reasons stated, the motion for summary judgment by defendant Klamath County and defendant Buck, in her official capacity, should be granted. In light of this finding, the court need not address defendants' remaining contentions.

Plaintiff also sues defendant Buck in her individual capacity. Qualified immunity shields government agents from suit for damages if a reasonable official could have believed that his or her conduct was lawful, in light of clearly established law and the information possessed by the official. Anderson v. Creighton, 483 U.S. 635, 637-39, 641 (1987); Hunter v. Bryant, 502 U.S. 224 (1991) (per curiam). This standard shields all government officials except those who are either plainly incompetent or who knowingly violate the law. Malley v. Briggs, 475 U.S. 335, 341 (1986). To determine if a defendant is entitled to qualified immunity, the court employs the sequential analysis set forth by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001).

First, the court must ask whether the facts alleged by plaintiff, taken in the light most favorable to plaintiff, establish a constitutional violation. Id. at 201; Robinson v. Solano County, 278 F.3d 1007, 1013 (9th Cir. 2002) (en banc). If no constitutional right would have been violated under the facts alleged, then the analysis ends. Saucier, 533 U.S. at 201. If a violation could be established under the facts alleged, the court will then consider whether the right was clearly established. Id.; Robinson, 278 F.3d at 1013. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. The court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. at 202. If the law does not put an officer on notice that his conduct was clearly unlawful, summary judgment based on qualified immunity is appropriate. Id.

On the threshold inquiry of whether, taking the facts alleged by plaintiff in the light most favorable to her, plaintiff has established a constitutional violation, the court has found that no constitutional violation is shown on the record. Accordingly, the qualified immunity analysis ends. The motion for summary judgment by defendant Buck, sued in her individual capacity, should be granted.

## IV. RECOMMENDATION

Based on the foregoing, it is recommended that defendants Klamath County's and Carrie Buck's motion for summary judgment (#57) be granted, and the claims against them be dismissed; and, if the court grants defendant DSI's motion for summary judgment, decided this same date, judgment should be entered in favor of defendants, dismissing plaintiff's claims with prejudice.

*__This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.__* **Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.** *__The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties have ten days within which to file a response to the objections.__* **Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the**

**Magistrate Judge's recommendation.**

DATED this _____4_____ day of April, 2005.


_____
UNITED STATES MAGISTRATE JUDGE