IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROSEANNA A. WILLIAMS,                                    Civil No. 03-6027-CO

        Plaintiff,                              FINDINGS AND RECOMMENDATION

        v.

KLAMATH COUNTY; et al.,

        Defendants.

COONEY, Magistrate Judge.

In plaintiff's second amended complaint, plaintiff alleges claims for section 1983 due process

violations against defendants Klamath County and Carrie Buck, and claims for defamation and

intentional infliction of emotional distress against defendant Developmental Systems, Inc. Plaintiff

seeks economic damages, non-economic damages, injunctive relief, and reasonable attorney's fees

and costs. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Before the court is

defendant Developmental Systems, Inc.'s motion for summary judgment (#52). Following the

telephone hearing on defendant's motion, defendant and plaintiff submitted supplemental briefing,

as allowed by the court.

## I. FACTS

In making the following findings of fact, the court considers the evidence in the light most

favorable to plaintiff:

The Oregon Department of Human Resources contracts with Klamath County to provide mental health services, alcohol and drug services and services for individuals with developmental disabilities. (Acker Decl. ¶ 14.)

Klamath County sub-contracts with Developmental Systems, Inc. ("DSI") to provide residential and vocational services to individuals with developmental disabilities. (Acker Decl. ¶¶ 14-15 & Ex. 1.) As part of the vocational services, DSI operates an Alternatives to Employment ("ATE") program for adults with developmental disabilities. (Acker Decl. ¶ 14)[1] DSI operates various facilities in Oregon for developmentally disabled adults including group homes in which they reside and the ATE program in Klamath Falls, Oregon. (Ex. 307 Acker Dep. 8:17-23; 9:18-19.) The ATE program is a community-based, out-of-home program that is designed to enhance the quality of life of its participants (known as "consumers") by providing activities that maximize consumers' independence, integration and productivity. (Acker Decl. ¶ 3 & Ex. 1.) At the time the issues in this lawsuit arose, there were approximately 28 disabled adults served at the ATE. (Ex. 306 Weathers Dep. 9:17-19.)

Donald Acker is the State Director of DSI. (Acker Decl; Ex. 307 Acker Dep. 6:11-12.)

Plaintiff was hired as a Personal Support Assistant ("PSA") at the ATE facility in July 1999. In or about April 2000, Plaintiff was promoted to Lead PSA. As a PSA, Plaintiff was responsible for interacting with consumers and facilitating their daily activities. Plaintiff was also responsible for supervising consumers to ensure the safety of the consumers and those around them. (Acker Decl.

---

[1]     The facts contained herein are based on the facts as they existed in 2002.

¶ 4.) Her duties included scheduling consumers' activities and ISPs,[2] van scheduling, scheduling for the Pacific Linen workshop, doing paperwork. She was also in charge of medications. (Ex. 304 Williams Dep. 127:2-7, 19-25; 128: 1-9; 129:21-23.) Her job generally was to make sure the staff were doing what they were assigned to do. (Ex. 306 Weathers Dep. 20:23-24.) She also provided input into the evaluation of the PSAs. (Ex. 306 Weathers Dep. 17:23-25; 18:1-2.)

Plaintiff was supervised by Paula Weathers, the ATE Program Director. Other PSAs at the ATE included Judy Gerard, Robyn Baker Lindsey, Rita Hastin Weber and Ronald Igou. All of the PSAs were supervised by Weathers. (Acker Decl. ¶ 8; see Aguila Decl.)

The ATE program is extensively regulated by state law and the Oregon Administrative Rules. (Acker Decl. Ex. 1.) See OAR 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 through 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. DSI has adopted mandatory abuse reporting policies and procedures, as required by state law. (Ex. 6.) All ATE employees are designated mandatory abuse reporters under state law. (Acker Decl. ¶ 5.) Employees are notified of their mandatory reporter status immediately upon hire and are provided written information regarding their obligations as mandatory reporters. (Acker Decl. ¶ 5; Exs. 5 and 6.) DSI's employees must submit written "incident reports" documenting any injury, accident, act of physical aggression or "unusual incident" involving a consumer. OAR 309-047-0005(25). All incident reports are reviewed by DSI's administrator and are submitted to the County and the individual consumer's case manager. (Acker Decl. ¶ 6; Buck Dep. 26:10-25.)

When an allegation of abuse involving a DSI employee has been reported, the County must decide whether to initiate a Protective Services Investigation ("PSI"). If the County decides to

---

[2]    The term, "ISPs," is not identified by the parties.

investigate, DSI will not conduct its own internal investigation because it would necessarily interfere with the County's investigation. (Acker Decl. ¶ 10.)

Neither statute nor DSI policies precludes DSI from doing an investigation after the completion of the county's investigation. (Ex. 307 Acker Dep. 32:15-23.) As a matter of practice, DSI will not conduct its own investigation after the County has investigated and concluded that an allegation of abuse has been substantiated. (Ex. 307 Acker Dep. 11:19-12:15; Acker Decl. ¶ 10.)

Under DSI's policy, any employee who is accused of abusing a consumer is immediately suspended pending the outcome of the County's investigation. (Acker Decl. ¶ 9.) Plaintiff was well aware of this policy. (Williams Dep. 148:9-12.)

If the County concludes that the allegation of abuse is substantiated, DSI always terminates the employee. (Acker Decl. ¶ 12; Barnes Dep. 79:11-19.) Plaintiff was well aware of DSI's policy. (Williams Dep. 148:18-23; 229:10-22.)

As part of the PSI, the County will typically interview the alleged victim, any witnesses, the alleged perpetrator and any other persons who may have knowledge of the facts of the abuse allegation or related circumstances. OAR 309-047-0035(5). The County may, but is not required to, photograph the victim of abuse. (Barnes Dep. 14:8-12.) See ORS 430.747.

Upon completing its investigation, the County prepares an Abuse Investigation and Protective Services Report. The report must include the County's "findings" regarding the abuse allegation, whether substantiated, unsubstantiated or inconclusive. OAR 309-047-0035(6). A "substantiated" finding "means that based on the evidence there is reasonable cause to believe that conduct in violation of the abuse definitions occurred and such conduct is attributable to the person(s) alleged to have engaged in the conduct." See ORS 430.747. To conclude that an

FINDINGS AND RECOMMENDATION - 4

allegation of abuse is substantiated, the County need only be convinced by a preponderance of the evidence. (Barnes Dep. 72:25-73:3; Buck Dep. 25:3-13; Guynn Dep. 16:9-16.)

On the morning of January 29, 2002, MM tried to grab a visitor to the ATE. Plaintiff was not present at that time. (Ex. 304 Williams Dep. 64:17-20; Ex. 301 Barnes Dep. 94:2-10; 95:2-8.)

On January 29, 2002, Judy Gerard submitted an Incident Report regarding Plaintiff's alleged treatment of a DSI consumer known as "MM." (Ex. 7.) MM is non-verbal and low functioning. (Acker Decl. ¶ 7.) The Incident Report stated that Gerard saw Plaintiff pinch MM on the left arm and upper back. (Ex. 7.)

The Incident Report was faxed to Donald Acker, Susan McCutcheon, MM's caseworker, and Catherine Barnes. (Ex 7.) Prior to filing the incident report, Gerard reported the incident to her supervisor, Paula Weathers. (Gerard Dep. 17:22-18:2; 18:8-15; 19:14-24.) Pursuant to DSI policy, and at Acker's instruction, Weathers suspended Plaintiff pending the outcome of the County's investigation. (Acker Decl. ¶ 8; Ex. 9.)

At approximately 5:00 p.m. on January 29, Gerard, a mandatory reporter, called Barnes, the lead investigator for Klamath County, to verbally report the alleged incident. (Barnes Dep. 13:13-24.) Gerard told Barnes that the alleged abuse happened between 12:00 and 12:30. When she reported it to Barnes, Gerard was "kind of hysterical" and "kind of rambled" and told Barnes that MM had been pinched, hurt "really bad," and was bleeding. (Ex. 301 Barnes Dep. 23:4-17.) Gerard initially told Barnes there were three marks; one was found to be an ingrown hair. (Ex. 301 Barnes Dep. 100:19-22.)

In her incident report, Gerard reported that MM's skin was broken. (Ex. 7.) At her deposition, she testified that she had seen fingernail marks on MM's upper shoulder, upper back,

FINDINGS AND RECOMMENDATION - 5

with skin broken on top of the shoulder blade, as well as fingernail marks and indentation on MM's arm. (Ex. 305 Gerard Dep. 41:5-11; 42:3-11.) Baker Lindsey, who saw MM shortly after the alleged incident, said that MM's skin was not broken and that there was no bruising. (Ex. 303 Baker Lindsey Dep. 18:18-20.)

Immediately after receiving Gerard's telephone call, Barnes and Barbara Guynn, also a County investigator, went to MM's group home to examine him. (Barnes Dep. 16:21-24.) Barnes, Guynn and Grace Eddins, the manager at MM's group home, examined MM on January 29, 2002. (Barnes Dep. 55:12- 6.) Barnes and Guynn reported seeing two red welts on MM's body–one on his arm and one on his upper back. (Guynn Dep. 27:21-28: 1; Eddins Decl.) The red welts were approximately 1-1/2 to 2 inches in length. (Guynn Dep. 23:23-24:9; 26:10-23.) Guynn took three or four photographs of MM's injuries. (Barnes Dep. 21:20-25; 22:8-15.) Due to a problem with the camera, the photographs did not turn out. (Ex. 10.) Eddins observed MM and saw no marks and told Barnes that she couldn't see any marks. (Eddins Decl.; Ex. 8.) Eddins told Barnes that MM tries to pull away when someone tries to assist him and grab his arm, and he crashes into things. (Ex. 301 Barnes Dep. 22:8-13; Ex. 8.)

Eddins examined MM shortly after the alleged abuse of MM. She found two small pink marks, one to the left of his neck and one at his waist. (Eddins Decl.)

MM's physical injuries were observed by no fewer than five individuals: Judy Gerard, Rita Hastin Weber, Robyn Baker Lindsey, Catherine Barnes and Barbara Guynn. (Ex. 8; Barnes Dep. 20:23-21:25; Eddins Decl.)

The next day, Barnes separately interviewed Judy Gerard, Robyn Baker Lindsey and Rita Hastin Weber. (Ex. 8.) Gerard and Baker Lindsey both reported to Barnes that they observed

Plaintiff pinch MM on the arm and upper back. (Ex. 8; Barnes Dep. 32:9-19; 40:7-14.)

Robyn Baker Lindsey told Barnes that MM "g[o]t pinched, or whatever" by Plaintiff. (Ex. 301 Barnes Dep. 40:8-12.) Barnes said that Baker Lindsey said she was 5 feet away when she saw Plaintiff pinch MM, try a shirt/belt hold, then pinch him. (Ex. 301 Barnes Dep. 95:17-20.) At her deposition, Baker Lindsey denied that she had seen the incident described by Gerard and denied that she had told Barnes that she had seen it. (Ex. 303 Baker Lindsey Dep. 13:19-25.)

Gerard told Barnes that, immediately after Plaintiff pinched MM on the back, she heard Plaintiff say: "You just have to show them who's Boss." (Ex. 8; Barnes Dep. 98:17-99:3.) Williams denies that she ever said "this is how we teach them who's boss." (Ex. 304 Williams Dep. 190:9-16.)

Barnes did not report that Gerard told her that Plaintiff had pushed MM onto a table and made him sit there, but reported to her that after the alleged pinching, MM stood and pulled his pants down. (Ex. 301 Barnes Dep. 59:18-25; 60:1-4.) At her deposition, Gerard testified under oath that Plaintiff had pushed MM onto a table and that he flipped around while she did so. She did not mention his taking his pants down. (Ex. 305 Gerard Dep. 32:11-13; 39:2-4.)

Gerard, Baker Lindsey and Hastin Weber all reported examining MM in the bathroom shortly after the incident. (Ex. 8; Barnes Dep. 37:2-24; 42:4-11.) All three indicated that MM had red marks on his left arm and upper back. (Ex. 8; Barnes Dep. 32:4-8; 42:4-11; 42:21-43:8.)

MM on occasion accidently scratched himself leaving red marks that would last for hours or days. (Exs. 19 & 302 Hastin Weber Dep. 11:11-25; 12:8-17.) MM scratched himself once a week or so. (Ex. 303 Baker Lindsey Dep. 11:13-17.) Sometimes MM gets scratched when he's having his clothes changed and he pulls away. (Ex. 304 Williams Dep. 186:9-20.) Occasionally MM would pick at himself and scratch himself, and if he had anything in his hand, would hit

himself. (Ex. 304 Williams Dep. 136:9-16.) MM sometimes arrived at the ATE with bumps and bruises. (Ex. 302 Hastin Weber Dep. 11:1-17.) MM has hurt himself accidentally. (Ex. 304 Williams Dep. 140:9-12; Hastin Weber Dep. 11:24-25; Gerard Dep. 14:7-8.)

Susan McCutcheon told Barnes that MM throws himself down on occasion. (Ex. 301 Barnes Dep. 54:8.)

After completing her initial interviews, Barnes received an anonymous phone call regarding another incident involving Plaintiff and MM. (Barnes Dep. 47:18; 48:7-25.) The caller reported that a DSI employee, Ronald Igou, had witnessed Plaintiff abuse MM a couple of months earlier. Barnes subsequently interviewed Igou who confirmed that, on October 29, 2001, he observed Plaintiff "fling" MM into a beanbag chair with sufficient force that he fell and hit his head on the wall, breaking the wallboard. (Ex. 8; Ex. 301 Barnes Dep. 47:17-25; 48:1-25; 49:11; 49:18-20; 51:11-18.)

Igou was a mandatory reporter. He also told Barnes that he had told coworkers about it at the time. (Ex. 301 Barnes Dep. 49:18-20; 51:11-18.) He had not reported the alleged incident in October. Igou testified that he had had no training in abuse reporting at the time of the alleged October incident. (Ex. 308 Igou Dep. 22:5-14.) At his deposition, Igou testified that during the alleged October incident, he saw Plaintiff put her hands on MM's shoulders and push him for several feet. (Ex. 308 Igou Dep. 14:2-12.) Igou said Plaintiff "tossed" MM into the sensory room. (Ex. 308 Igou Dep. 17:19-20.) Plaintiff denied pushing or flinging MM. She reported that he threw himself into the chair but misjudged its location. (Ex. 301 Barnes Dep. 61:1-2.)

When a person starts working as a PSA at the ATE, that person is given mandatory abuse reporting training on the day hired. A new employee is not allowed to work with consumers before completing the training. (Ex. 306 Weathers Dep. 43:1-5; 44:1-3.)

Barnes interviewed Plaintiff on January 31, two days after the alleged pinching incident. With respect to the January 29 incident, Plaintiff admitted that she "guided" him into another room. (Ex. 8.) When interviewed by Barnes about alleged pinch marks on MM, Williams said she didn't know anything about them. (Ex. 301 Barnes Dep. 59:18-25; 60:4.) With respect to the October 29 incident, Plaintiff stated that MM's head hit the wall with sufficient force to put a hole in the wallboard, but denied that she "flung" him into the beanbag chair. (Ex. 8.)

Judy Gerard had been MM's one-on-one caretaker at the time of the alleged abuse and had herself unsuccessfully tried to redirect MM just prior to the alleged incident. (Ex. 305 Gerard Dep. 24:16-18.) Gerard asked Plaintiff for assistance with MM on January 29, 2002, when MM had grabbed a consumer by the hair; Plaintiff twisted around, side stepped for a shirt/belt restraint so he would release the other consumer, they both went from the dining room into the main room, and she let go of him about half way into the room. (Ex. 304 Williams Dep. 110: 1-4; 114:8-9.).

If someone is wearing a tee shirt when the shirt belt hold is applied, one grabs a hunk of the tee shirt with the top hand. (Ex. 306 Weathers Dep. 40:17-20.)

Gerard told Baker Lindsey that she had witnessed Plaintiff do a shirt/belt restraint on MM and that his skin was pinched with hands instead of just the shirt during the hold. (Ex. 303 Baker Lindsey Dep. 14:20-23.)

Gerard told Weathers that she felt Plaintiff had abused MM, had pushed him and scratched him. (Ex. 306 Weathers Dep. 31:5-7.)

Prior to her report of the alleged abuse by Plaintiff, Gerard had heard both Baker Lindsey and Hastin Weber state that they thought Plaintiff did not like them. (Ex. 305 Gerard Dep. 53:4-25.)

Plaintiff and Gerard knew each other prior to Gerard's coming to work at the ATE because Gerard had previously delivered consumers from a group home to the ATE. (Ex. 304 Williams Dep. 176:11-24.)

MM is approximately 6 feet tall. (Ex. 301 Barnes Dep. 82:2-10.) Plaintiff is approximately 5 feet 4 inches tall. (Ex. 310.) In February 2002, Plaintiff weighed approximately 200 pounds. (Ex. 21.)

Prior to the alleged incident, Plaintiff had complained to Weathers about Baker Lindsey. (Ex. 306 Weathers Dep. 15:9-14.) Previously, Plaintiff had complained to Weathers about Baker Lindsey's negligence with regard to her duties and her consumers and about her attitude. (Ex. 304 Williams Dep. 156:17-20.) Both Baker Lindsey and Plaintiff intended to apply for the manager's position at the ATE which Baker Lindsey knew would soon be vacant. (Ex. 303 Baker Lindsey Dep. 23:22-24; 24:11-13.)

Baker Lindsey and Hastin Weber complained about Plaintiff. (Aguila Decl.) Baker Lindsey had also complained about Plaintiff to the ATE manager, Paula Weathers. (Ex. 306 Weathers Dep. 15:15-19; Ex. 304 Williams Dep. 156:17-25; 157:4- 15; Ex. 303 Baker Lindsey Dep. 26:8-14.) Baker Lindsey had complained to Weathers about Plaintiff's treatment of the staff. (Ex. 303 Baker Lindsey Dep. 26:8-14.)

Several months prior to the alleged incident, Baker Lindsey and several staff had met to decide what needed to be done about Plaintiff. (Ex. 302 Hastin Weber Dep. 28:7-9.) Hastin Weber did not attend the meeting. (Hastin Weber Dep. 40:14-17.)

Hastin Weber had applied for the lead PSA position at the time Plaintiff was hired. (Ex. 306 Weathers 52:3-7.) Hastin Weber had applied for the lead job which had been given to Plaintiff. (Ex.

306 Weathers Dep. 11:12-14.)

Prior to the alleged incident, Plaintiff had discussed with Weathers the fact that Hastin Weber was not coming back on time and doing what she wanted to do instead of what was on the schedule. (Ex. 304 Williams Dep. 170:13-23.)

Hastin Weber had complained to Weathers about the way Plaintiff ran the program. (Ex. 306 Weathers Dep. 16:19-24.) Hastin Weber wrote Plaintiff up on one occasion after Plaintiff called her an "f'g know it all" and that she "could shut [her] damned mouth." (Hastin Weber Dep. 61-24-62:18.)

Prior to the alleged incident, Plaintiff had been interviewed concerning an alleged abuse incident by Hastin Weber. (Ex. 304 Williams Dep. 145:21-25; 146:1-11.)

Before Plaintiff was fired, the staff knew that the manager's job at the ATE would be opening up. Plaintiff, Baker Lindsey and Hastin Weber had all expressed interest in applying for the job. (Ex. 304 Williams Dep. 217:3-23; Ex. 303 Baker Lindsey Dep. 23:10-24; 24:8-13.)

Donald Acker, state director for DSI, (Ex. 307 Acker Dep. 6:11-12), was aware of issues within the ATE labor force dealing with interpersonal frictions between the employees, (Ex. 307 Acker Dep. 23:3-5).

Based on MM's injuries, the witness interviews and the County's evaluation of the witnesses' credibility, and the hole in the wall, Klamath County concluded that the allegations of abuse were substantiated. (Ex. 8.)

DSI terminated Plaintiff's employment on February 4, 2002. (Ex. 13.) Acker's decision to terminate was based solely on the County's conclusion that the allegation of abuse had been substantiated. (Acker Decl. ¶ 12.) If the County had not substantiated the allegation of abuse,

Plaintiff would not have been terminated. (Acker Decl. ¶ 13.)

In January 2002, Plaintiff was 58 years old. (Ex. 310.) Her chosen profession is working with the developmentally disabled population. (Ex. 304 Williams Dep. 88:10-12.)

## II. LEGAL STANDARD

A moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact . . . ." Fed. R. Civ. P. 56(c); Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 636 (9th Cir. 2002). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002).

The moving party must carry the initial burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). The moving party meets this burden by identifying for the court portions of the record on file which demonstrate the absence of any genuine issue of material fact. Id.; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995). All reasonable inferences are drawn in favor of the non-movant. Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002), cert. denied, 537 U.S. 1106 (2003).

If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts which show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 & n.4 (1986). If the moving party presents evidence which, taken

by itself, would establish the right to a directed verdict at trial, the motion for summary judgment must be granted, in the absence of any significant probative evidence tending to support the opposing party's theory of the case. THI-Hawaii, Inc. v. First Commerce Fin. Corp., 627 F.2d 991, 993-94 (9th Cir. 1980); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. Devereaux, 263 F.3d at 1076.

## III. DISCUSSION

Defamation claim

Plaintiff alleges in her second amended complaint that the statements made to Catherine Barnes by defendant DSI's employees, Judy Gerard, Robyn Baker Lindsey, Rita Hastin Weber, and Ron Igou, were false and defamatory, and their publication caused her to lose her employment.

Defendant DSI contends that it is entitled to summary judgment because it is immune from civil liability under ORS 430.753 because Judy Gerard had reasonable grounds and a legal obligation to file an incident report, and plaintiff has no evidence of bad faith; and the defamation claim fails as a matter of law because the statements were true and defendant is entitled to a qualified privilege, and plaintiff cannot establish that defendant abused the privilege. Plaintiff responds that there are no reasonable grounds to support immunity, and there are disputed facts as to Gerard's true motivations and, therefore, her good faith. Plaintiff contends that there is a question of material fact as to whether the statements alleging that she abused MM were true; and that a conditional privilege may be lost if the person making a defamatory statement did not believe the statements he made.

FINDINGS AND RECOMMENDATION - 13

Defendant replies that the issue is not whether plaintiff in fact caused MM's injuries on January 29, 2002, but whether ORS 430.753, which provides immunity to individuals who participate in protective services investigations, apply in this case. Defendant contends that it is immune from liability because Gerard had reasonable grounds to file the incident report and plaintiff has no evidence of bad faith. It contends that the defamation claim fails because, in addition to the immunity discussed, it had a qualified privilege to make the statement.[3] In its supplemental brief, defendant contends that its employees are "private officials" within the statutory definition, ORS 430.735(9)© and, because plaintiff accepted its statement of fact that, "[a]ll ATE employees are designated mandatory abuse reporters under state law," the undisputed facts establish that its employees are mandatory abuse reporters. Defendant contends that plaintiff has no evidence that its primary motive in reporting the suspected abuse and participating in the County's investigation was improper. Plaintiff contends in her supplemental brief that, even if Judy Gerard was a "public or private official," defendant is not immune because Gerard's report was not made in accordance with the statute, which requires that a report be made "immediately," and in good faith, and with "reasonable grounds." Plaintiff contends that she raises questions of material fact regarding the motives of Gerard, Baker Lindsey, and Hastin Weber, and that summary judgment is not appropriate for determining motive, including whether a motive was "primary."

To establish a claim for defamation, plaintiff must show that defendant made a defamatory statement about plaintiff which was published to a third party, and that the statement was false.

---

[3]    In making its arguments in support of summary judgment, defendant points to certain facts and evidence in the body of its briefs, (Def. Mem. at 12, 15; Def. Reply at 8, 10-11, 12-13); however, these certain facts and evidence were not included in its concise statement of facts so that plaintiff could specifically attempt to controvert them with evidence of her own. For this reason, those purported facts and evidence were not considered by the court in making its findings.

Simpson v. Burrows, 90 F. Supp.2d 1108, 1126 (D. Or. 2000) (and cases cited); Wallulis v. Dymowski, 323 Or. 337, 342-43 (1996). A communication is defamatory if "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," Beecher v. Montgomery Ward & Co., 267 Or. 496, 499-500 (1973), or "would subject the plaintiffs 'to hatred, contempt or ridicule . . . (or) tend to diminish the esteem, respect, goodwill or confidence in which each is held or to excite adverse, derogatory or unpleasant feelings or opinions against them,'" Farnsworth v. Hyde, 266 Or. 236, 238 (1973). "'The gravamen of the tort of defamation is the injury to the plaintiff's reputation caused by a statement communicated to someone other than to the plaintiff.'" Kraemer v. Harding, 159 Or. App. 90, 103 (1999) (quoting Schenck v. Or. Television, Inc., 146 Or. App. 430, 435 (1997)). It is for the court to determine whether a communication is capable of a defamatory meaning. Farnsworth, 266 Or. at 238.

Defendant relies on ORS 430.753, which provides in pertinent part:

> (1) Anyone participating in good faith in making a report of abuse pursuant to ORS 430.743 and 430.765(1) and (2) and who has reasonable grounds for making the report, shall have immunity from any civil liability that might otherwise be incurred or imposed with respect to the making or content of the report. The participant shall have the same immunity with respect to participating in any judicial proceeding resulting from the report.

ORS 430.743 provides in pertinent part that, when a report is required under ORS 430.765(1) and (2), "an oral report shall be made immediately by telephone or otherwise" to the Department of Human Services or a law enforcement agency. ORS 430.765 provides in pertinent part that, any "public or private official" who, while acting in an official capacity, has reasonable cause to believe abuse of an adult with whom the official comes in contact has taken place, unless the information

is a privileged communication. A "Public or private official" is defined to include an "Employee of the Department of Human Services, county health department, community mental health and developmental disabilities program or private agency contracting with a public body to provide any community mental health service." ORS 430.735(8)(c).

It seems clear that defendant's employees are "private officials" within the mandatory abuse reporting statute. Moreover, plaintiff accepted defendant's proposed fact that its employees are mandatory abuse reporters, and offered her own fact that Judy Gerard was "a mandatory reporter," (Pl. Resp. to Concise Statement No. 314).

Plaintiff contends that Gerard had no reasonable grounds for making the report and an issue of material fact exist as to whether Gerard believed what she told Barnes, and as to the purpose of her report. Plaintiff utilizes the following definition of "reasonable ground" in the context of a common law qualified privilege: "Where a person lacks a belief in the truthfulness of what she says, there is no reasonable ground for the statement." (Pl. Opp'n at 6, citing Schafroth v. Baker, 276 Or. 39 (1976).) Plaintiff refers to various discrepancies in the description or characterization of MM's injuries, as shown in the record, such as a dispute whether the skin was broken, and Eddins observation that she saw "two small pink marks." Defendant does not address plaintiff's definition of "reasonable grounds," but contends that the immunity statute does not require that the person making the report be correct, only that he or she have "reasonable grounds." Defendant argues that reasonable grounds existed, relying on McDonald v. Children's Servs. Div., 71 Or. App. 751 (1985), which interpreted ORS 418.762, which defendant asserts is essentially identical to ORS 430.753.[4]

_____

[4]    ORS 418.750 to ORS 418.760 were child abuse and neglect reporting statutes. Franson v. Radich, 84 Or. App. 715, 720-21 (1987). ORS 418.762 provided in pertinent part: "Anyone participating in good faith in the making of a report pursuant to ORS 418.750 to 418.760 and who

FINDINGS AND RECOMMENDATION - 16

Defendant contends that the reasonable grounds requirement is a low threshold, relying on McDonald, where the person reporting was immune although he did not have personal, first-hand knowledge of the incident and had not examined or interviewed the victim. Defendant contends that Gerard had reasonable grounds because she was present and personally observed the incident; plaintiff admits she physically touched MM on January 29, 2002; and five people reported seeing red marks on MM's left arm and upper back.

McDonald concerned a report of child abuse. There, the court found that the person making the report had reasonable grounds and was entitled to immunity even though he did not have personal first-hand knowledge of the incident and had not examined or interviewed the victim. The court stated: "In order for plaintiffs to defeat [defendants'] motion for summary judgment, they had to raise an issue of fact concerning those defendants' good faith or their reasonable grounds to make a report." Id. at 755. The court found that plaintiff's affidavits stating that the child was scratched by kittens and, after the report was made, that the suspicion of child abuse was not substantiated by an examination or by the child's testimony at a hearing, did not raise issues concerning the good faith or reasonable grounds of defendant teacher and defendant principal who made the report in reliance on statements made by the child development specialist who examined and interviewed the child.

Here, the undisputed facts are that Gerard observed plaintiff pinch MM on the arm and upper back; Gerard, Baker Lindsey, and Hastin Weber, who examined MM in the bathroom shortly after the incident, indicated that MM had red marks on his left arm and upper back; County investigators

---

has reasonable grounds for the making thereof, shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed with respect to the making or content of such report." The statute was repealed in 1993, and was renumbered ORS 419B.025, Blachly v. Portland Police Dept., 135 Or. App. 109, 112 n.3 (1995).

Barnes and Guynn examined MM later in the day and saw two red welts–one on his arm and one on his upper back; and MM's physical injuries were observed by no fewer than five individuals: Gerard, Hastin Weber, Baker Lindsey, Barnes and Guynn.   While not determinative, Gerard's report was substantiated following investigation,  in contrast to the facts of McDonald, where the report was not substantiated but the court found reasonable grounds to make the report.  Considering only the facts known to Gerard at the time she made her report–her observation that plaintiff pinched MM and the examination of MM with Baker Lindsey and Hastin Weber, which corroborated what she believed she saw, the court finds that Gerard had reasonable grounds for making the incident report.

As to Gerard's good faith in participating in making the report, plaintiff offers no admissible evidence of any bad faith or improper motive of Gerard in making the report.  The discrepancies in what Gerard told different people, cited by plaintiff, are insufficient to raise an issue of fact.

In her supplemental brief, plaintiff contends that defendant is not entitled to statutory immunity because Gerard's report was not made in accordance with the statute, in that her report was not made "immediately" as required by ORS 430.743(1) but was made in the late afternoon.  At the hearing on defendant's argument, plaintiff appeared to argue that the delay in reporting was a factor to consider in determining Gerard's good faith.

The record indicates that the incident with MM occurred between 12:00 to 12:30 and that Gerard called Barnes at approximately 5:00 p.m.  The record also shows that Gerard examined MM with Baker Lindsey and Hastin Weber shortly after the incident; that she reported the incident to her supervisor, Weathers, before filing the report; and that the report was faxed to Acker, McCutcheon, and Barnes.  In the circumstances, the court cannot say that an abuse report, reported the same day as the alleged abuse, does not come within the statutory requirement that an oral report be made

"immediately" to the Department of Human Services or a law enforcement agency.

While the court finds that there are no issues of fact as to whether the statutory immunity applies to defendant DSI, it applies only insofar as to its employee, Gerard, who made the statements in the report.

Defendant also contends that it is immunized from liability for defamation based upon several conditional privileges. "A defamatory statement is privileged if it is uttered under such circumstances that the law grants immunity to the speaker." Wattenburg v. United Med. Labs., Inc., 269 Or. 377, 379 (1974). A statement is conditionally privileged if: "(1) it was made to protect the interests of defendants; (2) it was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the persons to whom the statement was made," Id. at 380 (citing 3 Restatement of Torts §§ 594-596 (1938)). These interest are labeled by Restatement (Second) of Torts §§ 594-596 (1977), as protection of 1) the publisher's interest, 2) the interest of the recipient or a third person, and 3) the "common interest" shared by several persons in the subject matter of the communication. See Wallulis, 323 Or. at 350 n.6 (Restatement (Second) of Torts §§ 594-596 (1977) virtually identical to Restatement of Torts §§ 594-596 (1938)). Whether a defamatory statement is privileged is a question of law for the court. Ivie v. Minton, 75 Or. 483, 486 (1915).

Defendant contends that the statements were made to protect it and its consumers, and were also a subject of mutual concern to all those who received copies of the incident report and the PSI report and are, therefore, privileged.[5] Plaintiff does not take issue with defendant's assertion that the

---

[5] As to the privilege protecting the recipient's interest,
(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

statements are privileged, but argues that the privilege was lost because *the speaker did not believe the statements made about her. She argues that questions of fact exist regarding the motives of defendant's employees.

Assuming that the statements at issue are defamatory, which the court does not decide, the court finds that the statements made by defendant's employees, Gerard, Baker Lindsey, Hastin Weber, and Igou, are conditionally privileged to protect defendant's interests and its consumers, and the common interest of those to whom the statements were made.

To overcome a privilege, "plaintiff must produce evidence of 'some kind of improper motive on defendant's part.'" Araujo v. Gen. Elec. Info. Servs., 82 F. Supp.2d 1161, 1172 (D. Or. 2000), aff'd, Nos. 00-35340, 00-35699, 2002 WL 24553 (9th Cir. 2002) (quoting Wattenburg, 269 Or. at 380). The circumstances under which a qualified privilege may be forfeited include:

> "The unreasonable exercise of the privilege is an abuse of the occasion which defeats the protection otherwise afforded. The occasion may be abused because of the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory matter; because the defamatory matter is published for some purpose other than that for which the particular privilege is given; because the publication is

---

(a) there is information that affects a sufficiently important interest of the recipient or a third person, and
(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.
(2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that
(a) the publication is made in response to a request rather than volunteered by the publisher or
(b) a family or other relationship exists between the parties.
Restatement (Second) of Torts § 595 (1977). As to the privilege protecting a common interest, "An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." Restatement (Second) of Torts § 596 (1977).

made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege; or because the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged."

Schafroth v. Baker, 276 Or. 39 45 (1976) (quoting Restatement of Torts § 599 cmt. a (cross-references omitted)). The Schafroth court went on to state:

"[I]f the privilege is otherwise established by the occasion and a proper purpose, the addition of the fact that the defendant feels indignation and resentment toward the plaintiff and enjoys defaming him will not always forfeit it. Perhaps the statement which best fits the decided cases is that the court will look to the primary motive or purpose by which the defendant apparently is inspired."

Schafroth, 276 Or. at 46 (quoting Prosser, Torts 794-95 (4th ed. 1971)).

Defendant argued at the hearing and contends in its supplemental brief that plaintiff has no evidence that its primary motive in reporting the suspected abuse and participating in the County's investigation was improper. Plaintiff contends that motive is a question of fact which is not appropriate for determination on summary judgment.

As already discussed, plaintiff offers no admissible evidence of any improper motive by Gerard, who volunteered the statements by making the report of alleged abuse. As to her co-workers, Baker Lindsey and Hastin Weber, plaintiff offers evidence that plaintiff had complained to their supervisor, Weathers, about both Baker Lindsey and Hastin Weber; Baker Lindsey and Hastin Weber had complained to Weathers about plaintiff; Baker Lindsey and met with other staff to decide what needed to be done about plaintiff; Hastin Weber had applied for the lead PSA position which had been given to plaintiff; and before plaintiff was fired, plaintiff, Baker Lindsey, and Hastin Weber had all expressed interest in applying for the ATE manager's job which was opening up. Plaintiff makes no argument and offers no evidence as to Igou's motive in making the

statements he did to Barnes during the investigation. Defendant contends that, even if Baker Lindsey and Hastin Weber would have benefitted from plaintiff's termination, this evidence is insufficient to create an issue of fact as to their motive or mental state. Defendant notes that Barnes and Guynn also saw red welts on MM's arm and back, as did Baker Lindsey and Hastin Weber, and plaintiff has not accused Barnes and Guynn of fabricating MM's injuries and falsifying their statements to the County. Defendant asserts that, as a matter of law, if there is no question of fact as to the statements Barnes and Guynn made regarding MM's injuries, there can be no question of fact as the statements Baker Lindsey and Hastin Weber made regarding MM's injuries.

The record shows that Baker Lindsey, Hastin Weber, and Igou participated in the investigation conducted by the County, responding to questions posed by Barnes as part of the investigation, and not volunteering the statements made to Barnes. The court finds that, in the circumstances of this case, where Gerard, Baker Lindsey, Hastin Weber, and Igou were all mandatory abuse reporters who were bound by the statutory requirement to report abuse, the evidence of complaints about each other and the fact that they all desired to apply for a manager's position coming open, do not raise a genuine issue of material fact as to their primary motive in making the statements to Barnes.

Defendant shows that it is entitled to the conditional privilege protecting the statements made to Barnes by Gerard, Baker Lindsey, Hastin Weber, and Igou, and plaintiff fails to offer evidence which raises an issue of fact for trial as to any improper motive which would forfeit the privilege. Defendant DSI's motion for summary judgment as to plaintiff's claim for defamation should be granted.

Intentional infliction of emotional distress claim

Plaintiff alleges in her complaint that the conduct of DSI's employees in making false and defamatory statements to Catherine Barnes constituted an extraordinary transgression of the bounds of socially tolerable conduct and that DSI intended to inflict emotional distress upon plaintiff or knew that such distress was certain or substantially certain to result from such conduct.

Defendant contends that the intentional infliction of emotional distress claim fails as a matter of law because there was no outrageous conduct, and there was no intent to inflict emotional distress. Plaintiff contends that there is an issue of material fact regarding the motives of Gerard, Baker, and Igou in making the defamatory statements about her, which affects the outrageousness element; and there is an issue of material fact as to whether defendant knew or should have known that the acts would cause plaintiff severe emotional distress. Defendant replies that the intentional infliction of emotional distress claim fails because there is no evidence of ulterior purpose, it is not responsible for Klamath County's investigation, and its policies did not require that it conduct its own investigation.

To recover on a claim for intentional infliction of emotional distress, plaintiff must plead and prove facts to show that: (1) defendant intended to inflict severe emotional distress on plaintiff, or knew that such distress was certain, or substantially certain, to result from the conduct; (2) defendant's acts were the cause of plaintiff's severe emotional distress; and (3) defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Staudenraus, 321 Or. 532, 543, 544-51 (1995).

Whether conduct is an extraordinary transgression of the bounds of socially tolerable conduct is "a fact-specific inquiry, to be considered on a case-by-case basis, considering the totality of the circumstances." Rosenthal v. Erven, 172 Or. App. 20, 23 (2001). "In considering whether the

defendant's acts were an 'extraordinary transgression,' the court will examine the purpose of the conduct and the means used to achieve the result. Not only must the conduct be deliberate, the *means* of inflicting the harm must be extraordinary . . . ." Shay v. Paulson, 131 Or. App. 270, 273 (1994) (citation omitted). A plaintiff cannot recover for "the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life. The conduct must be 'so offensive as to be outrageous,' 'outrageous in the extreme.'" Id. (citation omitted). "The conduct must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Montgomery v. J.R. Simplot Co., 916 F. Supp. 1033, 1041 (D. Or. 1994), aff'd, 76 F.3d 387 (9th Cir. 1996) (quoting Christofferson v. Church of Scientology, 57 Or. App. 203, 211 (1982)). As pertinent to this case, Oregon courts "consistently have held that a defendant's publication of a defamatory or otherwise significantly stigmatizing statement, knowing the statement to be false, unfounded, or unsubstantiated, is conduct that, if found to be true by a factfinder, constitutes an extraordinary transgression of what is socially tolerable." Checkley v. Boyd, 170 Or. App. 721, 727 (2000). Further, the Oregon courts have found that the relationship between the parties has a particular bearing on whether conduct may be characterized as extreme or outrageous. Delaney v. Clifton, 180 Or. App. 119, 130 (2002).

Defendant contends that it cannot be an extraordinary transgression of the bounds of social toleration to comply with one's legal obligation to report suspected abuse of a developmentally disabled individual. Plaintiff contends that defendant's contention can be sustained only if Gerard believed what she reported and, in light of the issues of fact as to her credibility, defendant's argument fails.

The court has found that, as to the alleged defamatory statements made to Barnes by Gerard, Baker Lindsey, Hastin Weber, and Igou, plaintiff offers no evidence of improper motive by Gerard or Igou, and her evidence as to Baker Lindsey and Hastin Weber is insufficient to raise a question of fact, where all were mandatory abuse reports who were bound by statute to report abuse. The same finding applies in this claim as to the element whether the conduct was outrageous in the extreme so as to exceed the bounds of socially tolerable conduct. In the circumstances here, where the speakers are mandatory reporters bound by statute to report suspected abuse, their statements made to the County investigator, cannot be outrageous.

To the extent that plaintiff argues that defendant's conduct was outrageous because of the purported incompleteness of the County's investigation, defendant is not responsible for the County's investigation; and to the extent that plaintiff argues that defendant's conduct was outrageous because it did not conduct its own investigation, plaintiff does not support her assertion that defendant's own policies required that it conduct its own investigation.

Because the element of outrageousness is lacking, the court need not address defendant's remaining argument as to plaintiff's claim for intentional infliction of emotional distress. Defendant DSI's motion for summary judgment as to plaintiff's claim for intentional infliction of emotional distress should be granted.

## IV. **RECOMMENDATION**

Based on the foregoing, it is recommended that defendant DSI's motion for summary judgment (#52) be granted, and the claims against it be dismissed; and, if the court grants defendants Klamath County and Carrie Buck's motion for summary judgment, decided this same date, judgment should be entered in favor of defendants, and dismissing plaintiff's claims with prejudice.

***This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals***. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. ***The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties have ten days within which to file a response to the objections***. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this _____ 4 _____ day of April, 2005.

_____
UNITED STATES MAGISTRATE JUDGE